528 A.2d 590

**Eugene R. LEWIS and Jane Lewis, his wife, Appellees,**

**v.**

**COFFING HOIST DIVISION, DUFF–NORTON CO., INC., Appellants.**

Supreme Court of Pennsylvania.

Argued Oct. 20, 1986.

Decided July 9, 1987.

Thomas F. Traud, Jr., Ronald L. Clever, Allentown, for appellants.

Robert C. Brown, Jr., Easton, for appellees.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

NIX, Chief Justice.

This is an appeal by an equipment manufacturer from a decision of the Superior Court, affirming the denial of the

manufacturer's motion for a new trial following an adverse jury verdict in a products liability case. We granted review to consider the appellant's assignments of error with respect to certain evidentiary rulings made by the trial court.

On August 1, 1978, Eugene Lewis, one of the appellees herein, was seriously injured while in the course of his employment on the production line of S.I. Handling Systems, Inc. At the time of his injury, Lewis was operating an overhead, electric chain-hoist to lift into position a sizeable, metal carriage assembly, which was a component of a machine being produced by his employer. The overhead electric hoist was such that it could be started and stopped, and its load maneuvered into various positions, by means of a "control pendant," which was comprised of a control box attached to a cable leading to the hoist motor overhead. The cable was expandable to a distance of about fifteen feet, making the control box, to a degree, portable. Protruding from the surface of the box were push-type buttons by which the hoist was operated. Accordingly, physical depression of one of the buttons would activate the hoist and cause it to perform one of its functions.

The injury to Lewis occurred when a carriage assembly became jammed on one of the hoists because of a stuck chain. In an effort to correct the situation, he moved the control pendant to a certain position relative to the suspended load. In the course of doing that he stumbled and fell, causing his thumb to strike the "down" button on the control box. As a result, the front end of the carriage assembly held aloft by the hoist chain became unstuck, swung forward, and hit Lewis in both legs. Besides suffering bruises, contusions and lacerations in the lower portions of both legs, Lewis also suffered fractures of the fibia and tibia of his right leg. As a consequence of his injuries, he was out of work for a year.

The electric hoist was a product of the Coffing Hoist Division of the Duff-Norton Company ("Coffing"). As a result of the injuries suffered by Eugene Lewis, he and his wife filed against Coffing, in the Court of Common Pleas of

Northampton County, an action asserting strict liability in tort pursuant to Section 402A of the Restatement (Second) of Torts, and also included counts charging negligence and breach of warranty. The complaint alleged, *inter alia,* that the control box for the hoist was defectively designed in that there was no guard or other protective feature over the buttons on the box to prevent accidental activation of the hoist. Just prior to trial the plaintiffs elected to proceed only on the theory of strict liability under Section 402A of the Restatement of Torts.

Based on an *in limine* motion by the plaintiffs, the trial court made certain rulings concerning the admissibility of evidence at trial. First, the court barred the defendant from putting into evidence a publication of the American Society of Mechanical Engineers ("ASME") setting forth standards respecting the manufacture of electric hoists and other industrial lifting equipment. The trial court excluded this evidence on the ground that the ASME publication was totally silent on the subject of the design and guarding of buttons on the control pendants of electric hoists. The court also ruled that the defendant could not present testimony, through its expert witness, that "at least ninety percent" of the electric hoists made in this country had control boxes devoid of any type of guard around the activating buttons. In excluding Coffing's evidence on this point, the court concluded that proof of the defendant's compliance with industry-wide standards, practices and customs would inject into the case concepts of negligence law, and that under our decision in *Azzarello v. Black Bros. Co.,* 480 Pa. 547, 391 A.2d 1020 (1978), negligence concepts have no role in a case based entirely on strict liability under Section 402A of the Restatement (Second) of Torts.

When the case came on for trial, the plaintiffs presented an expert witness who testified that the control box in question was defectively designed in that the push-type buttons should have been recessed instead of protruding from the surface of the box, or should have had metal flanges around them. According to the plaintiffs' expert,

each of these alternative designs would have been safer than the defendant's because they would prevent unexpected activation of the hoist through inadvertent physical contact with the buttons. In support of his further opinion that the suggested design alternatives were technologically and economically feasible, this witness was permitted to show the jury a model of a control box which featured recessed control buttons. He was also allowed to display photographs of an actual control box, made by another manufacturer of electric hoists, which had flanges around the control buttons.

Coffing called only one witness, Mr. William Ellis, who was the company's "Director of Products Reliability." Mr. Ellis testified that the control pendant involved in the case was designed in 1964 and was no longer used after 1977. He also stated that the instant case represented the first complaint about the safety of Coffing's control device, and that, in his opinion, it was safely designed. Ellis further opined that the model presented by the plaintiffs' expert witness, featuring recessed buttons, presented a greater risk of accidental activation than the defendant's. Regarding the plaintiffs' photographs showing an actual control box with protective flanges around its buttons, the defendant sought to offer proof that the manufacturer of that device also made one which had no type of guard around the buttons. The trial court barred that evidence as being irrelevant.

The jury returned a verdict in favor of Eugene Lewis in the amount of $51,692.80, and in favor of his wife for $5,000.00. After the court added delay damages, the respective awards were $63,036.72 and $6,097.27.

In its motion for a new trial Coffing did not challenge the sufficiency of the plaintiffs' evidence to support the verdicts, but asserted that the evidentiary rulings mentioned above constituted reversible error. The motion was denied by a court *en banc*, which endorsed the trial court's reasoning as to the evidence involved. Following the entry of judgment on the verdicts, Coffing appealed to the Superior

Court. That tribunal affirmed in a memorandum opinion. 346 Pa.Super. 639, 499 A.2d 404 (1985). Coffing next petitioned this Court for an allowance of appeal, which we granted.

As indicated, the question presented by this appeal is whether the trial court properly excluded the appellant's evidence of industry standards and practices relating to the design of control boxes for electric hoists. To resolve this issue, we must start by observing that the fundamental consideration in determining the admissibility of any evidence is its relevance to the fact sought to be proved. *Martin v. Soblotney*, 502 Pa. 418, 466 A.2d 1022 (1983). To be relevant, evidence must, as an initial matter, seek to raise an inference which bears upon "a matter in issue" in the case. *Commonwealth v. Scott*, 480 Pa. 50, 389 A.2d 79 (1978); *Commonwealth v. Kichline*, 468 Pa. 265, 361 A.2d 282 (1976); *Commonwealth v. Stewart*, 461 Pa. 274, 336 A.2d 282 (1975). The "matter in issue" in any lawsuit is determined mainly by the pleadings and the applicable substantive law. McCormick, Evidence § 185 (3d ed. E. Cleary 1984).

Section 402A of the Restatement (Second) of Torts, upon which the appellees exclusively relied for their right of recovery, provides as follows:

(1) One who sells any product in a *defective condition unreasonably dangerous* to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although (a) *the seller has exercised all possible care in the preparation and sale of his product,* and (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller. (Emphasis added.)

It is now well established that the foregoing provision imposes strict liability in tort not only for injuries caused by the defective *manufacture* of products, but also for injuries caused by defects in their *design*. *E.g., Azzarello v. Black Bros. Co., supra; Cronin v. J.B.E. Olson Corp.*, 8 Cal.3d 121, 104 Cal.Rptr. 433, 501 P.2d 1153 (1972). It must be noted, however, that Section 402A provides no definition of the term "defect," and thus, of itself, does not afford an effective working guide as to what kinds of factual circumstances will result in the imposition of strict liability on a manufacturer for injuries which are caused by its product. Consequently, the various jurisdictions have fashioned diverse formulas, most especially with regard to the subject of design defects.

One such approach to the question of design defect looks to "consumer expectations." Under this standard, a product may be found defective in design if it failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. *Barker v. Lull Engineering Co.*, 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443 (1978). Another test provides that a product may be found to be defective in design if, after the plaintiff proves that the design caused his injury, the defendant fails to establish that, on balance, the benefits of the challenged feature outweigh the risk of danger inherent in such design. *Id.; see generally* A. Weinstein, A. Twerski, H. Piehler & W. Donaher, *Products Liability and the Reasonably Safe Product* 43–59 (1978).

The decision of this Court in *Azzarello v. Black Bros. Co., supra,* sets forth yet another approach to the question of when a design defect may be found to exist. In *Azzarello,* this Court, after holding that the supplier of a product is a guarantor of its safety, further stated that: "the jury may find a defect where the product left the supplier's control *lacking any element necessary to make it safe for its intended use* or possessing any feature that renders it unsafe for the intended use." 480 Pa. at 559, 391 A.2d at 1027 (emphasis added).

As Dean Keeton observed, "[t]he change in the substantive law as regards the liability of makers of products and other sellers in the marketing chain has been from fault to defect." Keeton, *Product Liability and the Meaning of Defect*, 5 St. Mary's L.J. 30, 33 (1973). Recognizing that same principle, the appellate courts of most jurisdictions, regardless of the linguistic variations in their definitions of "defect," have held that it is the product itself which is on trial, and not the manufacturer's conduct. For example, in *Barker v. Lull Engineering Co., supra,* the California Supreme Court pointed out that in a design defect case based on strict liability, as contrasted with an action based on negligent design, the jury's focus is properly directed to the condition of the product itself, and not the reasonableness of the manufacturer's conduct. So too, the Supreme Court of Washington in *Lenhardt v. Ford Motor Co.,* 102 Wash.2d 208, 683 P.2d 1097 (1984), emphasized that under its rule of strict liability attention had to be focussed upon the product and not upon the actions of the manufacturer. Going further, the Court in *Lenhardt* said, with regard to a strict-liability case, that: "The liability of the manufacturer is measured solely by the characteristics of the product he has produced rather than his behavior and, therefore, strict liability does not sound in negligence." *Id.* at 213, 683 P.2d at 1100. *Accord Johnson v. Hannibal Mower Corp.,* 679 S.W.2d 884 (Mo.App.1984).

In harmony with the foregoing propositions is our decision in *Azzarello v. Black Bros. Co., supra.* Besides holding that a product is defective when it leaves the supplier's control lacking any element necessary to make it safe for its intended use, we also concluded, if not expressly, then certainly by clear implication, that negligence concepts have no place in a case based on strict liability. Indeed, Section 402A of the Restatement (Second) of Torts makes it clear that the imposition of strict liability for a product defect is not affected by the fact that the manufacturer or other supplier has exercised "all possible care."

Although there is general agreement among the courts of the various jurisdictions that the manufacturer's due care *vel non* has no bearing in a case based on strict liability for the defective design of a product, the courts part company when it comes to the relevance, and hence admissibility, of evidence showing industry standards, customs and practices concerning the design of products.

There are appellate courts which hold that evidence of industry standards is relevant to the question of whether a product design is "unreasonably dangerous," or that such evidence is probative of the feasibility of proposed alternative designs. *E.g., Rucker v. Norfolk & Western Ry.*, 77 Ill.2d 434, 33 Ill.Dec. 145, 396 N.E.2d 534 (1979); *Dugan v. Sears, Roebuck & Co.*, 113 Ill.App.3d 740, 69 Ill.Dec. 620, 447 N.E.2d 1055 (1983); *Back v. Wickes Corp.*, 375 Mass. 633, 378 N.E.2d 964 (1978); *Thibault v. Sears, Roebuck & Co.*, 118 N.H. 802, 395 A.2d 843 (1978); *Reed v. Tiffin Motor Homes, Inc.*, 697 F.2d 1192 (4th Cir.1982) (applying South Carolina law).

Other jurisdictions have taken a contrary view with regard to the relevancy of industry standards in a strict-liability case. Using the theory that negligence concepts are to be kept out of cases based on strict liability under Section 402A, various courts have excluded attempts by manufacturer-defendants to prove that the quality or design of the product in question comports with industry standards or is in widespread industry use. Such a holding was rendered by the Supreme Court of Washington in *Lenhardt v. Ford Motor Co., supra.* In *Lenhardt* the Court concluded that the question of whether or not the defendant has complied with industry standards improperly focusses on the quality of the defendant's conduct in making its design choice, and not on the attributes of the product itself. Therefore, in the view of the *Lenhardt* Court, such evidence should be excluded because it tends to mislead the jury's attention from their proper inquiry. The *Lenhardt* Court also observed that if a manufacturer's product has design attributes which make it unsafe for its intended use, there is no

relevance in the fact that such a design is widespread in the industry. *Accord Johnson v. Hannibal Mower Corp., supra.; Rexrode v. American Laundry Press Co.,* 674 F.2d 826 (10th Cir.1982) (applying Kansas law); *Olson v. A.W. Chesterton Co.,* 256 N.W.2d 530 (N.D.1977).

In *Holloway v. J.B. Systems, Ltd.,* 609 F.2d 1069 (3d Cir.1979), the Court of Appeals for the Third Circuit held that in a products liability case based on strict liability under Section 402A of the Restatement (Second) of Torts, it was inappropriate to admit evidence of industry standards and practices. The Third Circuit in that case, applying its interpretation of Pennsylvania law, concluded that "industry standards" go to the negligence concept of reasonable care, and that under our decision in *Azzarello* such a concept has no place in an action based on strict liability in tort. Although *Holloway* is not binding on this Court, we find it to be a correct interpretation of Pennsylvania law and that its reasoning is compelling. *See also Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893 (1975) (Opinion of Jones, C.J., announcing judgment of the Court) (improper to inject negligence principles into a strict liability case).

Having reached the conclusion that evidence of industry standards relating to the design of the control pendant involved in this case, and evidence of its widespread use in the industry, go to the reasonableness of the appellant's conduct in making its design choice, we further conclude that such evidence would have improperly brought into the case concepts of negligence law. We also conclude that such evidence would have created a strong likelihood of diverting the jury's attention from the appellant's control box to the reasonableness of the appellant's conduct in choosing its design. For those reasons we conclude that the trial court correctly ruled the evidence to be irrelevant and hence inadmissible. It is well established that a trial court should exclude evidence which has a tendency to distract the jury from its main inquiry or confuse the issue. *Levinson v. Commonwealth,* 395 Pa. 613, 151 A.2d 453

(1959); *Thompson v. American Steel & Wire Co.*, 317 Pa. 7, 175 A. 541 (1934); *McCaffrey v. Schwartz*, 285 Pa. 561, 132 A.810 (1926); *Velott v. Lewis*, 102 Pa. 326 (1883); *Cummings v. City of Williamsport*, 84 Pa. 472 (1877).

Accordingly, the order of the Superior Court affirming the Court of Common Pleas' denial of the motion for a new trial is affirmed.

LARSEN, J., joins in this opinion and files a concurring opinion.

FLAHERTY, J., files a dissenting opinion.

HUTCHINSON, J., files a dissenting opinion in which FLAHERTY, J., joins.

LARSEN, Justice, concurring.

I join the majority opinion which holds that evidence of industry standards is inadmissible by a manufacturer in a design defect products liability case under section 402A of the Restatement (Second) of Torts. Such evidence is irrelevant to the issue of whether the product left the manufacturer lacking any element necessary to make it safe, and because such evidence would tend to distract the jury from the proper inquiry and would confuse the issue.

The injection of industry standards into a design defect case would be not only irrelevant and distracting, but also, because of the inherently self-serving nature of "industry standards," would be highly prejudicial to the consumer/plaintiff. By our determination today, we have made it clear that a manufacturer cannot avoid liability to its consumers that it injures or maims through its defective designs by showing that "the other guys do it too."

FLAHERTY, Justice, dissenting.

While I join the dissenting opinion authored by Mr. Justice Hutchinson, I write separately to indicate that I would go further and admit appellant's proffered evidence that 90% of the industry uses a hoist switch like the one involved in appellee's accident.

In *Azzarello v. Black Bros. Co., Inc.*, 480 Pa. 547, 391 A.2d 1020 (1978), this Court noted that imposition of strict liability does not make suppliers insurers against all injuries suffered while using a product.

> What do we mean when we speak of strict liability of a manufacturer for harm caused by his product? It is sufficient for a plaintiff to show that he used the defendant's product and that he was injured? The answer to this is no.... If the theory is strict liability in tort, the plaintiff must still prove that the article was unsafe in some way. Thus, the liability is not that of an insurer; *it is not absolute in the literal sense of that word.*
>
> Wade, *Strict Tort Liability of Manufacturers*, 19 S.W.L. T.J. 13 (1965).

*Id.*, 480 Pa. at 553–554 n. 5, 391 A.2d at 1024 n. 5. (Emphasis supplied.) Thus, suppliers are not liable for all injuries, only those caused by a product that is unsafe.

An unsafe product was defined in *Azzarello* as one which "left the supplier's control lacking any element necessary to make it *safe* for its intended use...." *Id.*, 480 Pa. at 559, 391 A.2d at 1027. This standard imposes on suppliers liability for putting an *unsafe* product on the market. It does not impose liability for failing to make an already safe product somewhat safer, *or for failing to utilize the safest of all possible designs.* We are simply not dealing with conceptual Platonic ideals of perfection when a jury considers whether any given product is "safe."

The question for the jury was whether the switch was safe, and appellant was entitled to produce evidence tending to prove the product's safety. This is not a case where the presence of a safety defect is self-evident to a layperson; thus, expert testimony on the existence of a safety defect should have been admitted to assist the jury in its determination. Additionally, in my view, appellants were entitled to admit other evidence tending to prove that the particular switch involved herein was safe, including the fact that the switch is widely used in the industry—not conclusive by any means but at least probative to the issue.

Since admittedly evidence that 90% of the industry uses a similar switch is far from conclusive, it is indeed possible, as Mr. Justice Larsen implies in his concurring opinion, that widespread use shows nothing more than an industry-wide disregard for safety. The evidence would certainly be weightier coupled with evidence of a low rate of accidents, if, in fact, such exists. However, merely because a piece of evidence by itself has *little* probative value, is not reason to exclude it so long as it has *some* probative value. Moreover, considering evidence of industry-wide acceptance in connection with the position of the American Society of Mechanical Engineers that, in fact, the switch was safely designed, the jury could properly conclude that the widespread use is at the least probative of the industry's acceptance of appellant's design as a safe one. For these reasons, I would admit the evidence, not to show the reasonableness of appellant's use of the switch, but to show that users of the switch widely regard it as safe and so perhaps it is.

HUTCHINSON, Justice, dissenting.

I dissent.

I am compelled, in the words of a popular song, to "speak out against the madness." The instant madness is a creeping consensus among us judges and lawyers that we are more capable of designing products than engineers. A courtroom is a poor substitute for a design office. Design develops a product to perform a particular function within perceived physical, technical and economic constraints. As a creative process it is teamwork oriented, not adversary oriented. Academic experience, access to the proper tools and, most importantly, experience in the field are the attributes of a good engineer or engineering organization. Courts are at best novices in the designer's field and often illiterate in his language. The technical or design expertise we gain in one case is generally not transferable to the next. Nevertheless, we must provide an impartial forum when poorly designed products cause injuries.

To provide that kind of forum, we need all the help we can get. Accordingly, I do not believe that industry standards, like the American Society of Mechanical Engineers standards at issue here, are irrelevant to the issue of whether a product was defectively designed. The majority assumes that industry standards are relevant only to establish the duty of care, an element of a cause of action in negligence which is not required for strict liability. This view is too narrow.

Industry standards are written by individuals considered by their peers in industry, academia and research to be especially knowledgeable in a particular technical specialty. These standards contain their collective expert wisdom. The committees who prepare the standards are as respected in their fields as the American Law Institute, on whose formulation of the law of strict liability the majority relies, is in ours. Their collective opinion is at least as valuable as any individual expert witness's. Of course, these industry standards would not be conclusive, but their relevance and competence is clear.

The majority says that admission of industry standards is improper because the standards will necessarily introduce negligence concepts into products liability. However, it permits the opinions of individual experts hired by the parties to be admitted at trial. This is inconsistent. On the question of whether a product is poorly designed we should at least hear the opinions of those experts who operate in the shop or design office, where the atmosphere is somewhat more objective than the courtroom.

In addition, there is respectable legal opinion that liability for defective design cannot avoid the question of relative care, at least on the question of legal cause. *See Foley v. Clark Equipment Co.*, 361 Pa.Superior Ct. 599, 523 A.2d 379 (1987) (opinion by Wieand, J.).

FLAHERTY, J., joins in this dissenting opinion.