## Salva v. Harvey Industries

512

*Shanin Specter, Robert Englert, and Jonathan Cohen,* for plaintiff.

*William J. Ricci, Francis J. Grey Jr.,* for defendant Tamko Buildng Products.

*Frederick B. Buck,* for defendants Harvey Industries and Jackubowski.

*Daniel S. Altschuler,* for Defendant Emco Building Products Corp.

LONERGAN, *J.,* June 15, 2010—Plaintiff, Joseph Salva, appeals this court's order dated August 21, 2009, granting summary judgment in favor of defendants, Tamko Building Products, Inc., Harvey Industries Inc., and David Jackubowski. Incorporating in full the findings and order of this court dated August 21, 2009 (attached hereto as exhibit A).

## FACTUAL BACKGROUND

This opinion is an adjunct to this court's findings and order and is intended to supplement the facts and legal analysis more fully discussed therein.

On October 12, 2004, plaintiff Joseph Salva was employed by G. Cron Construction, which is owned by Greg Cron. (Complaint. p. 5.) On this date Cron ordered roofing supplies from Harvey Industries, which included rolled felt paper, for a roofing project to be completed

on Mr. Cron's garage located on his residential property in Lackawanna County, Pennsylvania. (*Id.*) It is contended by plaintiff, that the roofing supplies were delivered by an agent/employee of Harvey Industries, David Jackubowski, on October 13, 2004. On October 14, Salva, Cron and two other employees began working on the roofing project. (Complaint, p. 6, N.T. 2/29/08, pp. 30-31.) Cron and Salva had to lay several rows of roofing paper or "courses" on the roof. (Deposition of Cron, p. 163.) To lay the first course Cron and Salva stood on scaffolding Salva had erected. (Deposition of Cron, p. 191, deposition of Salva, pp. 114, 116.) Before laying the second course, Cron and Salva installed a "kicker board," a 2x4 plank installed perpendicular to the roof's surface. (Deposition of Cron, p. 30.) Cron and Salva stood on the kicker board to complete the second row or course of paper. (Deposition of Salva, pp. 128-129.) General practice called for the placement of additional kicker boards as the men worked their way up the roof, but Cron and Salva did not follow that practice. (Deposition of Cron, pp. 30-31; Salva, pp. 62-63, 212.) With no additional kicker boards in place, Cron and Salva positioned themselves for each new course of felt paper by walking on the most recently completed course of felt paper. It is alleged that as Cron and Salva were laying the felt paper, the felt paper that they were standing on ripped causing them to fall and slide down the roof. (Deposition of Cron, pp. 157-159.) Although Cron was able to stop himself before falling off the roof, Mr. Salva could not. Mr. Salva fell from the roof striking the scaffolding and falling to the ground below causing seri-

ous injuries. (Complaint, p. 7.) According to Cron, they had completed approximately 80 percent of the job and were near the top of the roof when Salva fell. (Deposition of Cron, p. 87.) The other employees working on the roof did not fall.

On October 11, 2006, John Salva (plaintiff) commenced this product liability and negligence action by filing a complaint against defendants Harvey Industries, David Jackubowski, Tamko Building Products Inc., Atlas Roofing Corporation, Certainteed Corporation, Continential Materials Inc., EMCO Building Products Corp., GAF Materials Corporation, IKO Production Inc., ISP Mineral Products Inc., Mid-States Asphalt & Cant Strip Inc. and Tarco Inc.[1] In the complaint, plaintiff states that Cron was supplied with a lesser grade felt paper (no. 15) than he ordered (no. 30), that materials were left outside when delivered and subject to the elements and that the combination of these factors resulted in the roofing felt to tear causing plaintiff to fall. (Complaint, pp. 6-7.) Plaintiff's complaint alleged counts of strict liability and negligence against Tamko and Harvey, while pleading a count of negligence only against Jackubowski. (Complaint, pp. 8-13.)

On January 5, 2009, Tamko filed its motion for summary judgment arguing that plaintiff's expert failed to

1. In the complaint, Tamko Building Products, Atlas Roofing Corporation, Certainteed Corporation, Continental Materials Inc., EMCO Building Products Corp., GAF Materials Corporation, IKO Production Inc., ISP Mineral Products Inc., Mid-States Asphalt and Cant Strip Inc. and Tarco Inc. are all listed as defendants who manufacture building and construction materials, including roofing felts.

establish that the tearing of the roofing felt was as a result of a manufacturing defect or negligence by any of the defendants. (Tamko motion for summary judgment, p. 8. (Control no. 09013939.) Defendants Jackubowski and Harvey Industries filed their motions for summary judgment on the same day and joined in the argument advanced by Tamko. (Harvey and Jackubowski motion for summary judgment, p. 3.) (Control no. 09010085.) In addition, Harvey and Jackubowski argued that plaintiff cannot establish that there is a reduction in tear strength when roofing felt is exposed to moisture and plaintiff failed to prove that no. 15 roofing felt was ordered instead of no. 30. (*Id.*)

On February 27, 2009, this court granted defendants' motions for summary judgment. This order was docketed on March 4, 2009. Plaintiff filed a motion for reconsideration as to this court's granting of summary judgment on March 15, 2009. This court entered an order on March 23, 2009 staying proceedings pending oral argument on the motion for reconsideration. An order was also entered on April 1, 2009 vacating the February 27, 2009 orders granting summary judgment.

After oral argument and additional briefing had concluded, this court entered a detailed findings and order on August 21, 2009 granting summary judgment in favor of Tamko, Jackubowski and Harvey. On September 8, 2009 plaintiff filed its notice of appeal to the Superior Court and issued its statement of errors complained of on appeal thereafter.

The issue to be addressed on appeal is as follows:

"Whether as a matter of law this court appropriately granted defendants' motions for summary judgment as to plaintiff's product liability and negligence claims where plaintiff failed to prove that it was the tearing of the roofing paper, and not the failure of his employer to implement mandatory fall protection, that caused him to fall."

## LEGAL ANALYSIS

"After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law whenever there is no genuine issue of any material fact as to a necessary element . . . ." Pa.R.C.P. 1035.2. The purpose of summary judgment under Rule 1035.2 is "to eliminate cases prior to trial where a party cannot make out a claim or a defense after relevant discovery has been completed." *Miller v. Sacred Heart Hospital,* 753 A.2d 829, 833 (Pa. Super. 2000) (quoting *Eaddy v. Hamaty,* 694 A.2d 639, 643 (Pa. Super. 1997). A plaintiff "must state a prima facie case before he will be allowed to proceed to trial." *Eaddy,* 694 A.2d at 643.

The crux of plaintiff's argument and the proffered expert reports are based on American Society for Testing and Materials (ASTM) standards, Underwriters Laboratories (UL) standards and International Building Codes (IBC). Plaintiff's expert reports were prepared by Simpson, Gumpertz & Heger Inc. (SGH report) and Timothy Barrett (Barrett report).

The expert reports indistinctly conclude that Tamko was negligent in its manufacturing and design of the roofing felt in that it was unsafe for use. (Barrett report, p. 9; SGH report, pp. 19, 23.) The Barrett report also opines that Mr. Jackubowski was negligent because he failed to ensure that Mr. Cron received a different roofing paper (no. 15) than that which he ordered (no. 30) was also a cause in the chain of events that lead to plaintiff's fall. (Barrett report, p. 6.) The Barrett report concludes that the paper ordered was "stronger" and all else being equal would have been less likely to tear under his footing." *Id.* Lastly, both expert reports opine that the roofing product delivered by defendant Harvey was weakened by exposure to rain and that as a result of same was made less safe. (Barrett report, pp. 7-8; SGH report, p. 4.)

In opining as to the cause of plaintiff's accident, plaintiff's experts rely on excerpts from the ASTM, UL Standards and IBC. These standards cited are not safety standards, rather they are performance standards. (Tamko motion for summary judgment, exhibit J.) Performance standards are implemented to ensure roofing product performance against weather conditions. The use of these standards were misapplied by plaintiff's experts in an attempt to establish a safety standard of the roofing felt as measured by the tear resistance of the paper when applied as an underlayment for the shingle roof.

As stated in this court's findings and order, none of the codes or standards cited by either expert as the basis for their opinions speaks to the issue of worker safety. The standards set forth are limited to the performance standards of roofs and roof coverings designed to es-

sentially keep the roof dry. (Findings and order, pp. 11-14.) In forming their opinions, these experts used irrelevant and inapplicable standards and therefore the reports do not prove a defect for safety purposes.

In addition, plaintiff cannot establish a prima facie case of negligence against Tamko, Harvey or Jackubowski defendants because plaintiff's employer Cron admittedly failed to implement proper fall protection according to the 29 C.F.R. §1926.501(b)(13). (Deposition of Cron, pp. 30-31; Salva, pp. 62-63, 212.) Thus, the focus of this court's analysis is on plaintiff's strict liability claims against Harvey and Tamko.

The law is clear that plaintiff has the burden in strict liability claims to prove that the product at issue was defective and that the defect was the cause of this accident. *Childers v. Power Line Equipment Rentals Inc.,* 452 Pa. Super. 94, 681 A.2d 201 (1996).

To prove this defect, the experts are required to have an adequate basis in fact and further, use relevant standards in expressing such expert opinions which serve the basis for their claims of defect and causation. *Kelly v. Thackray Crane Rental Inc.,* 874 A.2d 649 (Pa. Super. 2005), *appeal denied,* 586 Pa. 740, 891 A.2d 733 (2005).

In *Kelly,* plaintiff was proceeding under a theory of negligence. *Kelly* involved a crane accident whereby the plaintiff was injured when a load that was being lifted to an upper floor slipped when a cable which was part of a third-party cable lifting system failed. Plaintiff sued the crane operator and his employer the crane rental com-

pany. Plaintiff was employed by the same company that owned the proprietary lifting system which failed.[2]

Plaintiff's expert based his opinion upon certain regulations found in both the Occupational Safety and Health Act (OSHA) and American National Standards Institute (ANSI) standards.

These regulations stated in relevant part:

" '(2) All crawler, truck, or locomotive cranes in use shall meet the applicable requirements for design, inspection, construction, testing, maintenance and operation as prescribed in the ANSI B30.5-1968, Safety Code for Crawler, Locomotive and Truck Cranes.' The ANSI standard states: 'The operator shall be responsible for those operations under his direct control. Whenever there is any doubt as to safety, the operator shall have the authority to stop and refuse to handle loads until safety has been assured.'" ANSI B.30.5-3.1.2(d)-1968.

In granting summary judgment, the trial court found that the expert had used irrelevant and inapplicable standards because the operations were not under the control of the crane operator but were under the control of the employer. The Superior Court agreed with the trial court finding that the employer had direct control over the operation because "[employer] Dy-Core made the choice for the rigging mechanism, . . . Dy-Core employees attached the mechanism to the planks, Dy-Core employees removed the clamps, and Dy-Core employees acted as

_____

2. The employer was immunized from suit by the Pennsylvania Workers' Compensation Act. (citations omitted)

signalmen to Mr. Androssay, who operated the crane." *Thakray, supra* at 653.

Additionally, in *Lewis v. Coffing Hoist Division, Duff-Norton Co. Inc.,* 515 Pa. 334, 528 A.2d 590 (1987), our Supreme Court had before it a products liability action in which a ruling by the trial court excluding certain standards which were relied upon by a party's expert in forming an opinion that the product in question was not defective. The court affirmed the trial court's ruling that the standards used were irrelevant and therefore inadmissible and could not serve as a basis for the conclusion sought to be advanced. *Id.*

The Supreme Court of Illinois also had occasion to visit this same issue when it had before it a case involving the use of building standards used by a party's expert when opining as to defective steps of the defendant's building. In that case, the trial court allowed a plaintiff's expert to testify as to certain building codes which he claimed controlled the construction of the allegedly defective steps. Plaintiff's counsel was permitted to read such code to the jury as a consideration to determine if the steps were properly constructed. *Murphy v. Messerschmidt,* 68 Ill.2d 79, 368 N.E.2d 1299 (1977). The appellate court considering the issue found reversible error by the trial court in allowing plaintiff's expert to use such standards as established by the code. The Illinois Supreme Court affirmed hold in part that plaintiff failed to establish that the code plaintiff's expert was relying upon was relevant to the construction of the steps. *Murphy, supra.*

The issue was revisited by the Illinois Supreme Court in *Ruffiner v. Material Services Corporation,* 116 Ill.2d

53, 506 N.E.2d 581 (1987). The issue presented itself as a safety issue regarding the employer tugboat operator's installation of a ladder on the tugboat employee was working on when he fell and injured his back. Plaintiff's expert testified as to the failure of the ladder to meet certain safety standards that he opined existed and which he believed governed the ladder in question. The testing was allowed to be presented to the jury which awarded plaintiff damages. In reviewing the decision by the trial court, the Supreme Court, "concluded that plaintiff failed to demonstrate the relevance of the ANSI standards to the pilothouse ladders on the Irving Crown, and therefore, the admission of the standards into evidence was error." *Ruffiner,* 506 N.E. 2d at 581. The judgment entered for plaintiff was reversed and the matter remanded for a new trial. *Ruffiner, supra.*

The principle set forth in the above decisions clearly requires that an expert's opinion, in order to be admissible, must be relevant to the issue being advanced. In the instant case, the expert reports attempt to criticize defendants Harvey and Tamko in their design, manufacture, marketing and supply of the no. 15 NUL standard roofing felt stating that defendants breached safety standards which caused the roofing felt to be more susceptible to tearing when stood on. However, the experts' conclusions are not based on, nor do they cite to, any relevant safety standards in support of their conclusion.

Although Barrett's report vaguely states that Tamko's roofing paper does not comply with ASTM, UL or international building code standards, nowhere in the conclu-

sions does he specify which standards are not complied with and whether these standards are safety standards. (Barrett report, p. 6.)

Both reports also state that Harvey's storage of the roofing felt was not in accordance with National Roofing Contractor Association's (NRCA) recommendation that asphalt saturated roofing underlayment comply with ASTM 226 and ASTM 4869. (Barrett report, p. 7.)

Both experts opine that the roofing product delivered by defendant Harvey was weakened by exposure to rain and that as a result of same was made less safe. Such opinions ignore the uncontradicted testimony by the persons working on the roof that day which says that the paper was dry. (Deposition of Cron, pp. 101-103, findings and order, p. 4.) However, the assumptions and conclusions arrived at by these experts were based upon testing protocols that bear no relevance to the state of the product as it was employed as an underlayment for the shingle application.

The experts' opinions can be fairly stated as concluding that if the product was stored outside, it may have gotten wet and may have compromised the product, making it easier to tear. The reports are supported by testing protocols which subject a portion of a roll of paper to certain moisture procedures which demonstrates that a discrete section could absorb moisture and could make it tear more easily. These tests are irrelevant because the product was not stored and exposed as a single discrete sheet but as part of a large roll of paper. The roll of no. 15 roofing paper is 144 feet long by three feet wide according to the uncontradicted information. The roof

on Mr. Cron's garage was 90/40 feet long by 30 feet wide according to the building permit application of Mr. Cron. There is no evidence that the section which was beneath Mr. Cron and Mr. Salvo's feet was at the beginning of the roll. The experts failed to demonstrate that they attempted to determine what part of the interior of the 144-foot roll was applied to the roof and more importantly, how any level of moisture could have penetrated beyond the outermost layer. To duplicate the condition of the paper that was part of the interior part of the roll, it would have been necessary to subject the complete roll of paper as it was encased in the plastic wrapper to the ambient moisture conditions hypothesized to have existed during the period prior to the 144-foot roll being unwrapped. The experts' failure to even approximate the conditions as a prerequisite for the exemplar testing renders their conclusions as to the effect of moisture on the strength of the paper irrelevant.

The use of ASTM waterproofing performance standards and UL standards for property protection as a surrogate for safety standards is misplaced and directly contradicted by further statements made in the expert reports and the language contained in the standards themselves. (Findings and order pp. 13-15.) Ultimately, the Barrett report concludes that "Tamko no. 15 NUL 'standard' felt does not comply with UL standards." (Barrett report, p. 9.) The preamble to UL standards for roofing materials specifically states that its roofing standards are for property protection:

"UL works with the roofing industry to develop standards that improve performance of roofing materials and

systems for fire safety and/or property protection. From fire-resistance testing to emerging environmental requirements, UL provides the roofing materials and systems industry with a single source for all testing and certification." (Attached hereto as exhibit B.)

The report's references to ASTM standards 226 and 4869 are a further attempt to manufacture a safety standard for roofing felt. (Barrett report, pp. 4-7; SGH report, pp. 19-23.) The ASTM standards do not address fall restraints and are not designed to protect workers who install roofing components. These standards are performance standards and explicitly state such. The ASTM standard's only mention of safety rejects the notion that they are appropriate for judging such. Both ASTM D226 and D4869 contain the following qualification with respect to the test methods to be employed to determine the presence of the properties listed in the specification:

"This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use." Tamko's motion for summary judgment, exhibit J.

Additionally, both reports mention the IBC, but never cite any specific portion of the building code which would support a safety standard for roofing materials. Although the 2003 International Building Code cited in the reports does mention safety generally, it does not discuss requirements affecting the safety of construction workers.

Chapter 15 of the IBC, which is titled "Roof assemblies and rooftop structures," addresses the quality of the materials used on roofs and not the safety of workers. (Tamko's motion for summary judgment, exhibit J.)

Occupational safety is the exclusive province of the Occupational Safety and Health Administration (OSHA), and has been rather extensively regulated. Likewise, a review of the OSHA regulations applicable to residential roof construction would not disclose any performance specifications for asphalt saturated felt paper. See 29 C.F.R. §1926.501(b)(13). 29 C.F.R. §1926.501(b)(13) specifically requires:

"Each employee engaged in residential construction activities six feet (1.8 m) or more above lower levels *shall be protected by guardrail systems, safety net system, or personal fall arrest system* unless another provision in paragraph (b) of this section provides for an alternative fall protection measure." (emphasis added)

The fall protection plan must be in compliance with the terms and practices of 29 C.F.R. §1926.502. Plaintiff admittedly failed to adhere to this safety regulation. This court attached examples of what the appropriate proper fall protection system would have been for this project in its findings and order. (Findings and order, appendices 1, 2.) [Not published herein.]

Plaintiffs experts' use of performance standards, which are designed to measure the performance of roof underlayment paper, as a surrogate for safety standards, mimic the same application of erroneous standards as in the case law cited above. As a result, the expert reports

were found to be inadmissible against defendants on the issue of proving a defect for safety purposes. The proper safety standards for fall protection are mandated by the OSHA Code. which was not considered in plaintiff's experts' reports. Thus, plaintiff failed to produce any competent expert testimony that the defendants' conduct breached any safety standards.

## III. CONCLUSION

For the foregoing reasons, this court's order granting summary judgment in favor of defendants Tamko, Harvey and Jackubowski should be affirmed.

### EXHIBIT "A"

TERESHKO, J., August 21, 2009—

### FINDINGS AND ORDER

Now, pending before this court are the summary judgment motions of Tamko Building Products Inc., Harvey Industries Inc., David Jackubowski and Emco Building Products.

Pursuant to orders entered on February 27, 2009 (docketed March 4, 2009) this court granted the summary judgment motions of these defendants. Oral argument on the motions had not occurred because it had not been requested.

A motion for reconsideration was filed by plaintiff seeking reconsideration of the summary judgment motions granted in favor of defendants Harvey Industries and David Jackubowski (control no. 09010085) and defendant Tamko Building Products Inc: (control no. 09013939).

Plaintiff has not sought reconsideration of the order granting summary judgment in favor of defendant Emco Building Products (control no. 09126524) so that the order of dismissal shall remain.

On April 1, 2009, the court entered an order vacating the summary judgment orders as to Tamko, Harvey and Jackubowski for the purpose of tolling the statutory appeal period and to allow the parties oral argument on the reconsideration of the granting of the summary judgment.

The parties offered additional briefing on the reconsideration and offered oral argument.

The underlying matter is a product liability claim wherein plaintiff alleges that defendant Tamko manufactured a defective underlayment paper and the alleged defective paper was the cause of plaintiff's injuries.

The underlayment paper was being laid down on the roof of a garage prior to the application of roofing shingles to complete the roofing protection. The garage was being built by Gregory Cron on his residential property. Mr. Cron was Mr. Salva's employer at the time it was being built. Mr. Cron described it as new construction. (N.T. 10/30/2007, pp. 20-21, deposition of Cron.)

It is important to identify the dimensions of the garage roof in order to understand the way the subject roofing underlayment paper was to be placed on the roof. The surface of the roof was about 42 feet long and was peaked. Each side from cave (lowest end) to peak (highest end) was 16 to 18 feet.[1]

The roof was sloped at an "eight-12 pitch." This means that for every 12 inch horizontal travel, there would be an associated 8 inch vertical movement. (N.T. 10/30/07, p. 22, deposition of Cron.)

The paper was first applied at the lowest end (eave) by standing on a scaffold and rolling out the paper from one side to the other along the 42-feet length of the roof starting at the end. (N T. 10/30/07, pp. 90-91, deposition of Cron.) The next step would be to move on to the roof and begin the rolling process again.

"Q. Would you typically have the person who is unrolling on the same side as you or would they be just ahead of you in whatever direction it was unrolling?

"A. He would be ahead of me.

"Q. So as I understand it, you put the first row on and then you moved up and put another row on?

"A. Yes.

"Q. Do you have any, do you know how many rows of felt you had put on before the fall occurred?

"A. No.

---

1. The fall occurred when Mr. Salva was about 12 feet from the lowest end. (N.T. 10/30/07 p. 89, deposition of Cron.)

"Q. You put on more than one row, right?

"A. Yes.

"Q. And when you get to the second row, as you're stapling it down, I understand that there is some portion of about four inches that overlaps the lower portion; is that right?

"A. Yes.

"Q. So the next row up, the bottom four inches of that go over the top four inches of the preceding row?

"A. Yes.

"Q. When you're stapling the row, before moving up, do you staple that four-inch section at the top down to the roof or do you wait until you put the next row over it and staple them both together?

"A. I staple them both together.

"Q. So, when you're in the process of applying the next row, the row right below it would have a four-inch strip or so, without any staples in it, until you get to it with the overlap, right?

"A. No, that would all be stapled sporadically, as far as the V pattern all the way across and then I would come back through, hit the tops, it always had staples along the top. There was never any part of it where it wasn't. I would just fasten the next layer on to it so it won't blow off. I was not in the process of stapling the under part of that tar paper with the top one. It was just the top one sealing it down so the wind wouldn't get under it." N T. 10/30/07, pp. 91-92, deposition of Cron.

On the day of the accident, the paper was unrolled across the 42-feet length of the roof and a contemporaneous observation was made regarding the alleged "dampness" of the paper, noting that the "dampness" was confined to the outer layer of the roll which was laid out at the beginning of the unrolling process so that there would be no "dampness" at the point were the paper ripped.

"Q. On the day of the accident did you notice that the roofing felt was damp?

"A. It was a little damp, but it wasn't soaked, I didn't feel that it was—I didn't think there was anything wrong with it.

"Q. What portion of it was damp? In other words, I understand that it was in a roll. Was it the end, the outside, the entire roll, how would you characterize it?

"A. The ends.

"Q. The ends of the rolls were damp?

"A. Outside part of it.

"Q. And by ends we mean that once you laid it out it would be the top and the bottom of each row, would be a little damp?

"A. Just the edge showing to the exterior.

"Q. Okay. What I'm trying to understand is what portion of the paper was damp?

"A. The outer part of the roll.

"Q. And by outer part do you mean the part that is exposed as the roll is laying there or do you mean the edges top and bottom if it's standing on end?

"A. The outer part, not top or bottom.

"Q. What portion of the roll was being used by Mr. Salva at the time of the accident? In other words, did he have a new roll or was he halfway through a roll, do you have any recollection?

"A. No.

"Q. Were you standing on the end of a roll in its location on the roof at the time you fell? Do you understand what I mean?

"A. No.

"Q. On the row that you were applying at the time of the fall, was that one continuous roll all the way across or had you finished a roll and started another one somewhere during that course?

"A. We were finishing that roll.

"Q. So from left to right across the row would have been the same roll of paper being rolled out?

"A. Yes.

"Q. So you were not standing on an end of the roll at the time you fell?

"A. No.

"Q. And the place where the rip occurred, that was not on an end of the roll that was damp, as you described earlier?

"A. No.

"Q. That portion of the felt paper would have been dry?

"A. Yes.

"Q. Okay. And, you know, I forgot I should have asked you earlier. When you were doing the application of the felt paper, just before the time of the fall, where is the sun, is it shining on the roof or any portion of the roof?

"A. It was a gloomy day.

"Q. There wasn't much sunshine?

"A. It was a gloomy day.

"Q. Was the plywood roof decking wet or dry?

"A. It was dry." N.T. pp. 101-103, deposition of Cron.

Plaintiff was employed by Joseph Cron, (Cron Construction) who also worked on the job with his employees. Although Cron Construction did a mix of general construction work, the majority was roofing. (N.T. 2/29/08, pp. 30-31, deposition of Salva.) The roofing work consisted of two procedures which Mr. Salva learned through developing a system worked out by him and his employer, Mr. Cron.

"Q. And you know, I should have asked you this. Did you receive any on-the-job training in roofing from Mr. Cron after you started work for him?

"A. I don't know if I would call it on-the-job training. It was just continued practice with roofing.

"Q. He would give you tips and suggestions and techniques that he wanted you to use in working for him doing roofing work, that sort of thing?

"A. No, I don't think I would say that.

"Q. Tell me what you mean.

"A. I think that I would say that we were fairly good, and we just developed a different system that worked better for our particular combination of him and myself working together.

"Q. Okay. Tell me about the system that the two of you developed for working together doing roofing.

"A. Well, in the system, I mean, there was kind of a practice of he would be installing the shingles with the nail gun, and I would be handing him shingles, cutting the shingles prior to placing them on the roof. So it was really just a mater of getting into sort of a rhythm that works best for us.

"Q. What was the rhythm or system that you came up with for doing the felt underlayment for shingle roofs?

"A. He was generally the individual who would staple down the tar paper, and I was the individual that would roll it out for him.

"Q. Had you ever been the individual—did you ever switch roles when you worked with Mr. Cron?

"A. We did occasionally.

"Q. If you can give me an estimate, how much were you the unroller and him the stapler as opposed to vice versa?

"A. I would probably say that 60 to 70 percent of the time he was the individual stapling.

"Q. And 30 to 40 percent of the time you were the individual stapling, and he is the guy unrolling?

"A. Approximately." N.T. 2/29/08, pp. 31-33, deposition of Salva.

As Mr. Salva described the process, the first step of which would be to place the underlayment[2] on the roof to be followed by shingles.

"Q. And again, bear with me because I know nothing about roofing. Can you describe for me what he taught you about how to put on underlayment? And by that I mean—let's be specific. Felt underlayment.

"A. The general process of putting on the felt underlayment would be to start at the lowest portion of the roof and to tack it into place generally in the lower corner of which you were starting, and the individual would—one individual that was stapling would stay on that side holding the paper, and the other would start to roll the paper out.

"And then when you got to a certain point, you would make sure that the paper was straight. The individual who was stapling the paper would put a vertical line up the one edge, and then with the staple gun make a sweeping S pattern throughout the paper, making sure he always stapled the bottom edge of the paper very well until you got to the point where you met the person with the roll of paper.

"And that process would continue until you got to the edge of the roof, where you would cut the paper, staple the other end, and then repeat the process in the opposite direction.

"Q. Again, I apologize if I have to be basic, but I want to understand, and I don't know anything about this. So

---

2. This is the layer of waterproof protection that would be fastened to the wooden surface of the roof and was intended to keep the wood dry.

the first thing that happens, you get the paper on a corner of the roof. Was it a standard that you would start at the bottom left or the bottom right or did it vary?

"A. It varied.

"Q. So let's say on a particular roof you're starting at the bottom left. The first thing would be to tack down the bottom corner with a lot of staples just to hold it in place?

"A. Just to act as an anchoring point.

"Q. Left to right, so it didn't pull away?

"A. So once you unrolled, you can straighten it against the bottom edge of the roof.

"Q. So you unroll it some distance and get the orientation right so that it's straight across the roof; is that right?

"A. The individual with the staple gun would be on the left side of the roof holding it down along with the point that's stapled, and once the individual who was unrolling the paper would get to a certain point, they would both tighten the paper so it would become straight and flat, and then the person with the staple gun would proceed to staple the paper.

"Q. He puts a heavy line up the left edge of the staples where it's along the edge of the roof to set the orientation?

"A. Yes.

"Q. And as he does that, he's also doing a heavy layer along the bottom?

"A. He is also stapling the bottom of the paper.

"Q. Why was he stapling the bottom as opposed to the top of the paper?

"A. The top of the paper does receive some staples when you're going with the S pattern, and it's not particularly—has to be an S. It's just the motion in which you would staple. You would come down and do stapling along the bottom and come up and some staples on the top as well.

"The top doesn't receive quite as many staples because when you put the next layer of paper down, the bottom being stapled staples through the top of the previous paper because there's an overlap.

"Q. Were you taught any particular standard as to how many staples or how much interval should be between staples?

"A. I don't think there was any talk of a specific interval between staples." N.T. 2/29/08, pp. 34-37, deposition of Salva.

In addition to placing the paper on the roof and fastening it properly, there were certain procedures to be employed while moving over the paper and the necessity to properly fasten the paper.

"Q. Were you taught anything in particular in terms of how to stand on roofing felt while you are working on it? In other words, I heard some testimony from other witnesses that you were working with things you had to avoid in terms of standing on the edge of your feet or turning or moving quickly.

Were you taught anything like that by Mr. Srebro, in other words, how to stand or move on roofing felt when you're up there?

"A. I'm not sure that I can explain the teaching principles. It was more of a—the role of Ken Srebro was more of a guide in different situations. It wasn't a specific curriculum or standard.

"Q. No. I'm not suggesting it was. Did he ever tell you [you] should do this or you should not do this in order to avoid problems with damaging the felt when you were standing on it?

"A. I believe it was generally explained, the way you should walk on paper.

"Q. What was generally explained to you in that regard?

"A. I believe it was more of a flat-footed standing position.

"Q. I'll apologize again. The reason is, don't assume I know anything about this, okay. So I am looking for even the most basic principles.

"So you've told me that when you're standing or walking on the felt, you should remain flat-footed?

"A. Yes.

"Q. Because what?

"A. I believe it was from a position of being stable, yourself personally and—I think that's all.

"Q. Did you ever receive any advice or instructions from Mr. Srebro or Mr. Cron about the hazard that could be posed by tearing roofing felt while you are standing or working on it?

"A. I'm not really sure what you mean by that question.

"Q. Well, did anybody ever tell you when you were working with Mr. Srebro or Mr. Cron that it could be hazardous if the roofing felt you were standing on tore?

"A. I think it was common knowledge that the material needed to be secured before walking on it due to risk of falling off of a roof.

"Q. The hazard associated with not putting enough staples in and not adequately fastening the roofing felt, would be that it could tear or come loose while standing on it?

"A. I believe so.

"Q. And that's something you learned at least by the time you left Mr. Srebro's employ, correct?

"A. Yes." N.T. 2/29/08, pp. 65-67. deposition of Salva.

When the accident occurred, both Mr. Cron and Mr. Salva were standing on the underlayment paper that had been stapled to the roof by Mr. Cron as Mr. Salvo was unrolling it.

"Q. Well, we're just approximating here, nobody counted the staples, I'm sure. Did you put additional staples in, ordinarily, aside from the V-shaped staples as you went along?

"A. Yes.

"Q. Where would you put those, in the middle of the V, in the open space between the V's?

"A. On the bottom. I always go across the bottom of it where it would overlap, and then come back through the middle.

"Q. Okay. And how about on the top, would you put them there as well?

"A. Yes.

"Q. In addition to the V staples, 20 per leg, you would have horizontal kind of staples; am I correct?

"A. Yes.

"Q. How many of those per V?

"A. I'm not sure, that was the, the V pattern is what really put it down and then I would come back through with the, you know, I would say in a piece of tar paper I would go through the V pattern and then I would come back through and do the bottom and then staple through the centers and on the top.

"Q. In any event, the course of felt paper that you were standing on, it was stapled all the way to the, what did you call the edge of the roof, there is a construction term for that?

"A. The rake.

"Q. Rake. It was stapled all the way to the rake in the pattern that you suggested; am I correct?

"A. To my best recollection, yes.

"Q. Was there just one tear in the felt paper at the time of the incident?

"A. I don't remember. I know that we both slid on it and I remember it slid over here. Whether it slid on Joe's side first or not, we both went down together.

"Q. The felt paper, the course of felt paper that you were standing on, did everything between you and Mr. Salva come loose?

"A. It ripped. it ripped behind me and then it came loose.

"Q. When you say it ripped behind you, as you're facing the roof in front of you uphill, it ripped to your left or to your right?

"A. I believe my left.

"Q. To your left?

"A. Like I was standing on it. I am trying to remember how it actually ripped. It is hard to remember that part of it. But I remember it tore and we slid down.

"Q. Tell me if you don't know and tell me if you do know.

"A. I'm trying to remember. I don't know.

"Q. With regard to any question I ask. Was there more than one rip, the one rip being the one that you think was probably to your left?

"A. I don't know.

"Q. Did you ever see a rip over in Mr. Salva's direction?

"A. Not at that time. I remember sliding.

"Q. You said that you believe that the piece, a piece of felt paper came off the roof at the time that you and Mr. Salva were sliding down the roof?

"A. Yes, that was under our feet." N.T. 10/30/07, pp. 157-59, deposition of Cron.

When they were standing on the paper, it pulled away from the staples that had been previously applied by Mr. Cron and, "tore out from under our feet."

"Q. Was Mr. Salva unrolling the felt paper with his hand or with his foot?

"A. His hands.

"Q. Would this require him to pull on it or?

"A. No.

"Q. The reason I ask is—

"A. He is only going out on four to six feet increments so he's not really having to pull on it. He was balancing the base and just putting it on the roof and rolling it out and cutting it. At this point in time right here when we're walking across the roof, from left to right, on, most of the application is, we're walking on plywood. From this point we started getting up towards the, in the upper part we started to then stand on the tar paper.

"Q. When you—

"A. That's when it tore.

"Q. When you're standing on the tar paper, was the tar paper supporting your weight or was there something underneath it?

"A. There was a kicker below, three feet below.

"Q. Right, I understand that.

"A. Right, the tar paper.

"Q. There was no plywood underneath your feet?

"A. Yes, there is plywood, the whole thing is plywooded, we're just tar papering it now, it's already plywooded.

"Q. Right. And that's why I'm not following why you lost your balance when the tar paper tore?

"A. The tar paper tore and then we slid down the roof and he skipped past the kicker. He was further out on the edge of the roof. That's why he didn't catch the kicker because half his foot went over the edge instead of getting the kicker.

"Q. I understand that. But what I'm not following is why you both lost your balance or slid once when the tar paper tore?

"A. It tore out from under our feet.

"Q. Were both your feet on the roll of tar paper?

"A. Not—the tar paper was already down.

"Q. Right. I understand that.

"A. Yes. We were on the tar paper.

"Mr. Riley: Can I interject?

"Mr. Partenheimer: Yes.

"Mr. Riley: You were standing, both you and Mr. Salva were standing on the roll of tar paper that had already been stapled to the plywood?

"The Witness: Yes." N.T. 10/30/07, pp. 129-31, deposition of Cron.

After the accident, Mr. Salva was transported by ambulance for critical emergency care. The roofing job was completed the next day by continuing to lay down and staple the same underlayment paper and then continuing to staple the roofing shingles to the roof through the underlayment paper.

The whereabouts of the specific paper that Mr. Salva was standing on is a disputed issue because it was either discarded or restapled to some part of the roof when the roofing job was completed.

For purposes of this motion, it is assumed that the exemplar paper that was used in the testing procedure by plaintiffs experts is from the same roll of underlayment paper that was laid on the roof at the time of the fall and was manufactured by Tamko and is known as "Tamko no. 15 felt paper."

In offering their opinions on the cause of Mr. Salva's tragic accident, plaintiff's experts rely upon standards which purport to evaluate the strength of the Tamko paper as measured by the tear resistance of the paper when applied as an underlayment for the shingle roof. Ostensibly, this was done to create a baseline safety standard of fall protection to protect Mr. Salvo while unrolling and stapling the paper on the roof prior to stapling the shingles to the roof.

In order to establish this safety standard the experts looked to what they believed to be the relevant building codes in effect at the time of this accident.

"Building codes and standards

"The International Building Code 2003 edition. in effect for the Borough of Moosic, Pa., on 14 October 2004, requires one-ply of either ASTM D226- Type I or ASTM D4867 Type I as underlayment for roofing shingles. (Ref. International Building Code 2003. par. 1507.2.3 appendix C.)" Report of Simpson Gumperty & Heger, Nov. 2008, p. 2. (SGH report.)

This building code referred to, speaks nothing to the issue of worker safety and is self-limiting to the performance standards of roofs and roof coverings.

"Roofs and roof structures

"Section 1501.1 General

"1501.1 Scope: The provisions of this chapter shall govern the materials, design, construction and quality of roofs and roof coverings.

"Section 1503.1 General: For all roofs and roof coverings required by the code, the construction documents shall illustrate, describe, and clearly delineate the type of roofing system, materials, fastening requirements and flashing requirements which are to be installed.

"Section 1504.1 General: All roofs shall be covered with approved roof coverings properly secured to the building or structure to resist wind and rain. Roof coverings shall be designed, installed and maintained in accordance with approved manufacturers' installation instructions such that the roof covering shall serve to protect the building or structure." *Id.*

Clearly, the building code requirements are meant to insure that the roof and the building thereunder are weatherproof. Therefore, the focus on these requirements for a safety standard for workers is misplaced speculation.

The appropriate regulatory body that maintains safety codes is the Occupational Safety and Health Administration (OSHA). Under the General Applicability section of the OSHA regulation (29 CFR 1910.(a)) the standards contained in this part shall apple with respect to employ-

ments performed in a state . . . .[3] The two standards cited by both of plaintiffs experts, are ASTM D226 Type I and

---

3. It is noted that this action is a product liability and failure to warn claim and does not include a claim against plaintiff's employer, Joseph Cron, for failure to comply with the employee safety requirements set by OSHA. The lack of this claim does not obviate the legal necessity to include the mandatory safety requirement imposed by OSHA and does not allow for a non-safety standard to be substituted by plaintiff's experts. The safety standard required by OSHA is found under 29 C.F.R.§1926, subpart M-Fall protection, generally and as it relates to this roofing job since it is more than six feet from the ground the relevant section is 29 C.F.R §1926.50l(b)(13), specifically.

"Residential construction: Each employee engaged in residential construction activities six ft. (1.8 m) or more above lower levels shall be protected by guard rail systems, safety net system or personal fall arrest system unless another provision in paragraph (b) of this section provides for an attentive fall protection measure . . . ."

The alternative procedures referred to above are found in the *Plain Language revision of OSHA instruction std. 3.1 at XII. A(1) and C(2).*

"(A) General requirements

"(1) Trained workers only

"Only workers who have been trained to be proficient in the alternative methods of fall protection shall be allowed on to the roof.

(C) Slide guards: Requirements for materials, configuration

"2.(a) Material: All slide & installation guards must be constructed of 2"x 6" nominal stock.

"(b) Installation: Continuous slide guards shall be installed along the eave as described above. Additional slide guards shall be installed below each work area at intervals not to exceed eight feet. They shall be installed using the following procedure: The employee, while standing on the slide guard below secures the roof jacks for the next slide guard with nails and then installs the planks. The employee then climbs up to the new slide guard to continue the roofing work. This sequence is repeated as work proceeds up the roof.

"Note: (As per C-l(b) . . . The roof jacks . . . shall be installed using nails long enough to withstand an employee sliding into the guard). The use of this fall protection as it applies to the roofing job that Mr. Salva was engaged in is demonstrated by photographs attached here as appendix 1 and appendix 2. [Not published herein.] These photo

ASTM D4867. Plaintiff's experts rely upon a waterproofing performance standard for the manufacture of this paper product and then attempt to assert that this same standard can also be used as a safety standard for protecting the workers performing the installation of the roof covering.

The use of these ASTM waterproofing performance standards as a surrogate for safety standards is specifically rejected by the ASTM documents themselves.

"This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use."

The Barrett report of 10/31/08, is less clear about what standards are being used to evaluate the roof safety aspect of underlayment paper. Like the SGH report, it too does not reference the OSHA fall protection requirements for the roofing site.

The Barrett report discusses many issues and arrives at certain conclusions but never identifies what standards are being used and how he arrived at his conclusions other than a decidedly subjective evaluation which appears to be based on irrelevant and extraneous factors.

Mr. Barrett begins his expert report by indicating that he was surprised to learn that Tamko made "so many variations of no. 15 asphalt felt. There is no issue in this

---

graphs are of the Cron roof just prior to and during the removal of the roof portions with shingle and underlayment for inspection purposes-for this action. This fall protection complies with the OSHA standards identified above."

case regarding the fact that Mr. Salva's employer, Mr. Cron, an experienced roofer, received and applied the no. 15 asphalt paper that is at issue. Mr. Barrett goes on to say that "it was my expectation that Tamko no. 15 would have been designed and manufactured to meet the industry requirements and building code regulations for underlayments for use in steep slope roofing products including the International Building Code which has been part of the Pennsylvania Uniform Construction Code since April 9, 2004. Nowhere in his report does he identify what those standards are as they relate to the "safety" factors that he goes on to refer to.

"Tamko's failure to test its no. 15 standard for tensile strength, tear strength, thickness, percentage of saturation properties, ash content, puncture resistance and asphalt saturant as was and is common practice in the industry, while all the while marketing it as a roofing underlayment for steep slope application, completely disregarded the safety of the people that it knew would be working with their product on steep sloped roofs. Tamko's failure to design, manufacture, and test its product to ensure its safety rendered its product defective, and unsafe and unfit to use in steep slope roofing where, as here, it would be susceptible to tearing and causing serious injuries."

After rendering his conclusions as to how the defendant's failure to test the product somehow made it unsafe and how the design and manufacturer made it unsafe, he fails to point to any standard which would support such a conclusion.

Later on in his report, the expert, Mr. Barrett, does refer to a standard:

548

"Tamko no. 15 NUL 'standard' felt does not comply with UL standards. (U.L. identifies Underwriter Laboratories.)" Barrett report, 10/31/08, p. 9.

A further reference to the UL standards is found on page 5 of this same report:

"It bears noting that Tamko's no. 15 standard certification as a UL prepared roofing accessory only related to its fire resistance as an accessory to a completed underlayment installation fastened to wood decking with shingles installed over it. The UL prepared roofing accessory designation does not require and is not a certification for the minimum safety standards for tensile strength, percentage of saturation properties, ash content, and asphalt saturant that are required to be met by other UL certifications or by other industry regulations."

The criticism here states that the product does not withstand U.L. standards (ostensibly for safety) but later admits that the U.L. standard is not a safety standard. The "safety standard" the expert explains, is found in "other U.L. certifications or by other industry regulations." (Barrett report, 10/31/08, p. 5.) The expert fails to support this conclusion by identifying what those "safety standards," are and where they are found.

The facts in this case are uncontested that Mr. Salva's employer, Mr. Cron was an experienced roofer who knowingly took delivery of the Tamko no. 15 underlayment paper and applied it to the garage roof that he and Mr. Salva were working on. The expert opines that a factor in causing the chain of events that followed and culminated in Mr. Salva's fall, "was Mr. Jackubowski's

(employee of defendant Harvey Industries), failure to ensure that Mr. Cron got a different roofing paper than that which he used on the roof the day of the accident. (Barrett report, 10/31/08, p. 6.) His conclusion in this regard was that this other paper was "stronger" and all else being equal would have been less likely to tear under his footing." *Id.*

In rendering this conclusion, the expert creates a duty "out of whole cloth" and then goes on to opine that breach of this duty was a link in the chain of causation.

The duty he creates is for defendant to put a different paper on Mr. Cron's roof at the time of this accident. The expert cites no facts to support such a duty. If no duty exists, than the alleged breach cannot have been a legal cause of this accident.

Under the analysis required to demonstrate that this product was not it for its intended use, it is legally incompetent to support such analysis by claiming that defendant should have supplied a different product to plaintiff

Both experts SGH and Barrett opine that the roofing product delivered by defendant Harvey was weakened by exposure to rain and that as a result of same was made less safe. Such opinions ignore the uncontradicted testimony by the persons working on the roof that day which says that the paper was dry. But more problematic is the fact that the assumptions and conclusions arrived at by these experts were based upon testing protocols that bear no relevance to the state of the product as it was employed as an underlayment for the shingle application.

The experts' opinions can be fairly stated as concluding that if the product was stored outside, it may have gotten wet and may have compromised the product making it easier to tear. The opinions are supported by testing protocols which subject a portion of a roll of paper to certain moisture procedures which demonstrates that a discrete section could absorb moisture and could make it tear more easily. These tests are irrelevant because the product was not stored and exposed as a single discrete sheet but as part of a large roll of paper. The roll of no. 15 roofing paper is 144 feet long by three feet wide according to the uncontradicted information. The roof on Mr. Cron's garage was 90/40 feet long by 30 feet wide according to the building permit application of Mr. Cron. There is no evidence that the section which was beneath Mr. Cron and Mr. Salva's feet was at the beginning of the roll. The experts failed to demonstrate that they attempted to determine what part of the interior of the 144-foot roll was applied to the roof and more importantly, how any level of moisture could have penetrated beyond the outermost layer. To duplicate the condition of the paper that was part of the interior part of the roll, it would have been necessary to subject the complete roll of paper as it was encased in the plastic wrapper to the ambient moisture conditions hypothesized to have existed during the period prior to the 144-foot roll being unwrapped. The experts' failure to even approximate the conditions as a prerequisite for the exemplar testing renders their conclusions as to the effect of moisture on the strength of the paper irrelevant.

The plaintiffs experts, in their respective reports, investigated the properties of other roofing paper for the

purpose of determining the relative properties of these products as an alternative to the product being used by Mr. Cron for his roof.

Although not specifically articulated. the underlying premise for such investigation is to demonstrate that stronger paper would have provided greater fall protection for Mr. Salva. After conducting extensive testing on the alternate paper, it can be said that some roofing papers have greater tensile (tearing) strength than others but plaintiff's experts fail to show that any of these papers would have provided any measure of fall protection to Mr. Salva and point to no regulatory or industry standard which showed that any paper used would be an adequate fall protection to replace the fall protection mandated by OSHA as described above.

## CONCLUSIONS

The legal analysis in this matter concerns the plaintiff's experts' use of inappropriate and irrelevant standards in determining that the product made by defendant Tamko, and sold by defendant Harvey Industries Inc., was defective.

The law is clear that plaintiff has the burden in this strict liability claim that the product at issue here was defective and that the defect was the cause of this accident. *Childers v. Power Line Equipment Rentals Inc.,* 452 Pa. Super. 94, 681 A.2d 201. (1996).

To prove this defect, the experts are required to have an adequate basis in fact and further, use relevant standards in expressing such expert opinions which serve the

basis for their claims of defect and causation. *Kelly v. Thackray Crane Rental Inc.,* 874 A.2d 649 (Pa. Super. 2005), *appeal denied,* 586 Pa. 740, 891 A.2d 733 (2005).

In *Kelly,* plaintiff was proceeding under a theory of negligence.[4] This was a crane accident case whereby the plaintiff was injured when a load that was being lifted to an upper floor slipped when a cable which was part of a third-party cable lifting system failed. Plaintiff sued the crane operator and his employer, the crane rental company. Plaintiff was employed by the same company that owned the proprietary lifting system which failed.[5]

Plaintiff's expert based his opinion upon certain regulations found in both the Occupational Safety and Health Act (OSHA) and American National Standards Institute (ANSI) standards.

These regulations stated in relevant part:

" '(2) All crawler, truck, or locomotive cranes in use shall meet the applicable requirements for design, inspection, construction, testing, maintenance and operation as prescribed in the ANSI B30.5-1968, Safety Code for Crawler, Locomotive and Truck Cranes.' The ANSI standard states: 'The operator shall be responsible for those operations under his direct control. Whenever there is any doubt as to safety, the operator shall have the

4. Although a negligence standard of care is not at issue here, a proper standard must still be used by these experts.

5. The employer was immunized from suit by the Pennsylvania Workers' Compensation Act. (citations omitted)

authority to stop and refuse to handle loads until safety has been assured.'" ANSI B.30.3-3.1.2(d)-1968.

In granting summary judgment, the trial court found that the expert had used irrelevant and inapplicable standards because the operations were not under the control of the crane operator but were under the control of the employer. The Superior Court agreed with the trial court finding that the employer had direct control over the operation because "[employer] Dy-Core made the choice for the rigging mechanism, . . . Dy-Core employees attached the mechanism to the planks, Dy-Core employees removed the clamps, and Dy-Core employees acted as signalmen to Mr. Androssay, who operated the crane" *Thakray, supra* at 653.

Here, plaintiff's expert used performance standards of roofing underlayment paper designed to judge the ability of the paper to be properly installed on a roof and enhance the waterproofing performance of the roofing system as a standard for fall protection safety.

Since fall protection was clearly governed by other standards (OSHA), the application was erroneous.

In *Lewis v. Coffing Hoist Division, Duff-Norton Co. Inc.,* 515 Pa. 334, 528 A.2d 590 (1987), our Supreme Court had before it a products liability action in which a ruling by the trial court excluding certain standards which were relied upon by a party's expert in forming an opinion that the product in question was not defective. The court affirmed the trial court's ruling that the standards used were irrelevant and therefore inadmissible and could not serve as a basis for the conclusion sought to be advanced. *Id.*

The Supreme Court of Illinois, had occasion to visit this same issue when it had before it a case involving the use of building standards used by a party's expert when opining as to defective steps of the defendant's building. In that case, the trial court allowed a plaintiff's expert to testify as to certain building codes which he claimed controlled the construction of the allegedly defective steps. Plaintiff's counsel was permitted to read such code to the jury as a consideration to determine if the steps were properly constructed. *Murphy v. Messerschmidt,* 68 Ill.2d. 79, 368 N.E.2d 1299 (1977 The appellate court considering the issue found reversible error by the trial court in allowing plaintiff's expert to use such standards as established by the code. The Illinois Supreme Court affirmed hold in part that plaintiff failed to establish that the code plaintiff's expert was relying upon was relevant to the construction of the steps. *Murphy, supra.*

The issue was revisited by the Illinois Supreme Court in *Ruffiner v. Material Service Corporation,* 116 Ill.2d 53, 506 N.E.2d 581 (1987). The issue presented itself as a safety issue regarding the employer tugboat operator's installation of a ladder on the tugboat employee was working on when he fell and injured his back. Plaintiff's expert testified as to the failure of the ladder to meet certain safety standards that he opined existed and which he believed governed the ladder in question. The testing was allowed to be presented to the jury which awarded plaintiff damages. In reviewing the decision by the trial court, the Supreme Court, "concluded that plaintiff failed to demonstrate the relevance of the ANSI standards to the pilothouse ladders on the Irving Crown, and therefore, the admission of the standards into evidence was error."

*Ruffiner,* 506 N.E.2d at 581. The judgment entered for plaintiff was reversed and the matter remanded for a new trial. *Ruffiner, supra.*

The principle that informs the above decisions clearly requires that an expert's opinion, in order to be admissible, must be relevant to the issue that is being advanced. In the instant case, plaintiff's experts' use of performance standards, which are designed to measure a product's respective adequacy as a waterproofing roof underlayment paper as a surrogate for safety standards, mimic the same application of erroneous standards as in the cases cited above. As a result thereof, the expert reports are found to be inadmissible against defendants on the issue of proving a defect for safety purposes. The proper safety standards for fall protection are mandated by the OSHA Code which was not considered in plaintiff's experts' legally incompetent analysis and conclusions.

Therefore, considering the above and the record as a whole, the motions for summary judgment filed by defendants Tamko Building Products and Harvey Industries Inc., are granted.

---

APPENDIX 1

Photo Attached [Not published herein.]

---

APPENDIX 2

Photo Attached [Not published herein.]

# EXHIBIT "B"

UL | Roofing Materials

### Roofing materials

Backed by more than 150 years of UL experience in evaluating roofing materials and systems, the UL Mark is the most widely recognized and required certification mark in the industry. UL works with the roofing industry to develop standards that improve performance of roofing products and systems for fire safety and/or property protection. From fire resistance testing to emerging environmental requirements, UL provides the roofing materials and systems industry with a single source for all testing and certification.

As part of the UL certification process, ongoing unannounced product inspections take place at manufacturers' facilities to maintain quality and integrity. UL's follow-up service is a key reason why products that bear the UL Mark component are more readily accepted.

### Full range of testing and certification services offered

UL provides a full range of services for the testing and certification of roofing materials and systems, including fire resistance, impact resistance, wind uplift resistance and material performance. UL's services are available for both commercial and residential roof materials and systems.

Upon earning UL certification, manufacturers' products are listed in the UL product directory, which is referenced by more than 2,500 authorities having jurisdiction (AHJs) and code officials each year.

UL also offers ENERGY STAR testing for roofing materials and systems, an increasingly valuable service as more and more state and local municipalities require roofing materials and systems to meet ENERGY STAR and similar requirements.

UL is an accredited test laboratory for the Cool Roof Rating Council (CRRC), an independent organization that develops methods for evaluating and labeling the solar reflectance and thermal emittance of roofing products.

By partnering with UL, manufacturers can complete all their testing and certification needs with a widely recognized, independent organization that regulators trust and rely upon.

UL tests roofing materials and systems to the following standards:

### Fire resistance

- UL 790 (Exterior Exposure), Standard Test Methods for Fire Tests of Roof Coverings
- CAN/ULC-S107-03 (UL 790), Methods of Fire Tests of Roof Coverings
- UL 1256 (Interior Exposure), Fire Test of Roof Deck Constructions
- CAN/ULC-S126-M86 (UL 1256), Standard Method of Test for Fire Spread Under Roof - Deck Assemblies

### Wind resistance

- UL 997, Wind Resistance of Prepared Roof Covering Materials
- ASTM D3161, Standard Test Method for Wind Resistance of Asphalt Shingles (Fan - Induced Method)
- UL 2390, Test Method for Wind Resistant Asphalt Shingles with Sealed Tabs
- ASTM D7158, Standard Test Method for Wind Resistance of Sealed Asphalt Shingles (Uplift Force/Uplift Resistance Method)

### Uplift resistance

- UL 580, Tests for Uplift Resistance of Roof Assemblies
- UL 1897, Uplift Tests for Roof Covering Systems

### Material/product performance

- UL 2218, Impact Resistance of Prepared Roof Covering Materials
- UL 55A, Materials for Built Up Roof Coverings
- ASTM D3462, Standard Specification for Asphalt Shingles Made from Glass Felt and Surfaced with Mineral Granules
- CAN/CSA A123.5, Asphalt Shingles Made from Glass Felt and Surfaced with Mineral Granules

### Thermal radiative properties (for compliance with ENERGY STAR and CRRC requirements)

- ASTM C1371, Standard Test Method for Determination of Emittance of Materials Near Room Temperature Using Portable Emissometers
- ASTM C1549, Standard Test Method for Determination of Solar Reflectance Near Ambient Temperature Using a Portable Solar Reflectometer

Copyright 2010 Underwriters Laboratories Inc.